UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

NEW YORK BANKERS ASSOCIATION,
INC.,

                                   Plaintiff,

                       v.

CITY OF NEW YORK, *et al.*,

                            Defendants.

------------------------------------------------- X

| |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: September 9, 2014 |

13 Civ. 7212 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

       Plaintiff New York Bankers Association ("NYBA") initiated this action on

October 11, 2013, seeking (i) a declaratory judgment that City Local Law 38 for

the Year 2012 ("LL 38"), entitled the "Responsible Banking Act," was preempted

by federal and state law; and (ii) a permanent injunction prohibiting the

implementation of LL 38.  Plaintiff now moves for summary judgment on its

claims.  By contrast, Defendant Council of the City of New York (the "Council")

moves to dismiss the Complaint on the grounds that Plaintiff does not have

standing to pursue its claims, that its claims are not ripe, and that LL 38 is not

preempted.  For the reasons discussed in the remainder of this Opinion, the

Court grants the Council's motion to dismiss the Complaint because Plaintiff

lacks standing to pursue the claims it raised in October 2013, and denies as

moot Plaintiff's motion for summary judgment.

## BACKGROUND

### A.      Factual Background[1]

Plaintiff NYBA is an association of approximately 140 commercial banks and federal savings associations located in New York State.  (Compl. ¶ 8). NYBA's members include national banks chartered pursuant to the National Bank Act of 1864 ("NBA"), ch. 106, 13 Stat. 99 (codified as amended in scattered sections of Titles 12, 19, and 31 of the United States Code); federal savings associations chartered pursuant to the Home Owners' Loan Act of 1933 ("HOLA"), Pub. L. No. 73-43, 48 Stat. 128 (codified as amended at 12 U.S.C. §§ 1461-1470); and commercial and thrift depository institutions chartered pursuant to the New York Banking Law ("NYBL").  (*Id.*).  Several NYBA members serve as depositories for the funds of the City of New York (the "City"). (*Id.* at ¶ 9).

### 1.      The City Deposit System

The New York City Banking Commission (the "Banking Commission") was created in 1873 under the City Charter.  (Compl. Ex. 3; N.Y.C. Charter § 1524(1)).  The members of the Banking Commission are the Mayor of the City (the "Mayor"), the City Comptroller (the "Comptroller"), and the Commissioner of the City Department of Finance ("DOF").  (*Id.*).  Among other things, the

---

[1]      The facts alleged herein are drawn from the Complaint ("Compl.") (Dkt. #1), and the materials attached thereto.  For convenience, the parties' briefs in connection with the motion to dismiss will be referred to as "Council Br."; "Pl. Opp."; and "Council Reply." The parties' briefs in connection with the motion for summary judgment will be referred to as "Pl. Br."; "Council Opp."; and "Pl. Reply."  Lastly, transcripts of proceedings occurring before the Court will be referred to as "[Month] [Day] Tr."

Banking Commission is responsible for designating which banks and savings associations may hold the City's funds.  (*Id.*; *see also* N.Y.C. Charter § 1524(1) (the Banking Commission "designate[s] the banks or trust companies in which all moneys of the city shall be deposited, and may by like notice in writing [to the Commissioner of the DOF] from time to time change the banks and trust companies thus designated")).  Only institutions designated as deposit banks, or New York City Designated Banks ("Designated Banks"), by the Banking Commission may hold City funds.  (Compl. Ex. 3).

To become a Designated Bank, an institution must submit an application that includes audited financial statements, historical financial information, an overview of the current managerial structure, its most recent federal Community Reinvestment Act rating,[2] and other detailed information.  (Compl. Ex. 3).  In addition, an institution must have a physical presence in the City. (*Id.*).  As of May 2013, there were 25 Designated Banks, 17 of which were NYBA members.  (*Id.*; Compl. Ex. 2).

### 2.    Local Law 38 and Its Enactment

Plaintiff seeks to have LL 38 declared preempted by federal and state banking laws.  While the legislative history of LL 38 is relevant to the issue of

---

[2]    The federal Community Reinvestment Act ("CRA"), Pub. L. 95-128, 91 Stat. 1147 (1977) (codified as amended at 12 U.S.C. §§ 2901-2908), provides that "regulated financial institutions have [a] continuing and affirmative obligation to help meet the credit needs of the local communities in which they are chartered."  12 U.S.C. § 2901(a)(3).  To this end, the CRA "provides that a federal regulatory agency must 'assess the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods ... and ... take such record into account in its evaluation of an application for a deposit facility by such institution.'"  *Lee* v. *Bd. of Governors of the Fed. Reserve Sys.*, 118 F.3d 905, 909 (2d Cir. 1997) (quoting 12 U.S.C. § 2903(a)(1) & (2)).

Plaintiff's preemption claims, it is decidedly less relevant to the issue of whether Plaintiff has standing to pursue those claims.  Because the Court need not, and does not, reach the issue of preemption, it need not discuss the legislative history of LL 38.  Accordingly, it will suffice here to state that LL 38 was passed by the Council on June 28, 2012, over the May 30, 2012 veto of then-Mayor Michael R. Bloomberg.  (Compl. Ex. 11, 12, 15).

LL 38 has several components.  Principally, LL 38 establishes a Community Investment Advisory Board ("CIAB"), comprised of eight members: (i) the Mayor or his designee; (ii) the Comptroller or his designee; (iii) the Council Speaker (the "Speaker") or her designee; (iv) the Commissioner of the Department of Housing Preservation and Development; (v) the Commissioner of the DOF; (vi) a member of a community-based organization "whose principal purpose is community and/or economic development, or consumer protection" designated by the Speaker; (vii) a representative of an organization or association that represents small business owners designated by the Speaker; and (viii) a representative of the City banking industry designated by the Mayor.  (LL 38 sec. 1, subdiv. 2).  The members of the CIAB were to have been appointed within 60 days of the date LL 38 took effect, or by August 27, 2012. (*Id.*)  As of the filing of the Complaint, and as of August 19, 2014, the CIAB had not been fully appointed and had not convened a meeting.  (Aug. 19 Tr. 6-8).[3]

---

[3]     At oral argument, the Court inquired of the parties whether, under LL 38 or some other authority, the CIAB could meet and/or take action before all of the constituent appointments had been filled.  Counsel for the City was uncertain; counsel for the Council expressed doubts that either could occur; and counsel for NYBA expressed concern that the CIAB could take action with a majority of the members appointed. (Aug. 19 Tr. 6-9, 10-12).  Counsel for the three parties offered similar responses to the

The CIAB has three primary functions.  First, it is tasked with completing a needs assessment.  Specifically, the CIAB must assess the "credit, financial and banking services needs throughout the City with a particular emphasis on low and moderate income individuals and communities" (the "Needs Assessment").  (LL 38 sec. 1, subdiv. 1(a)).  To achieve this goal, the CIAB must (i) convene "at least one public hearing in each borough of the city"; (ii) "accept[], review[], and consider[] public comments which describe the nature and extent of such needs"; and (iii) consider certain data and information pertaining to the City's deposit banks.  (*Id.*).  The first Needs Assessment was to have been published on the DOF's website by no later than March 1, 2014.  (*Id.*).  As of the filing of the Complaint, and as of August 19, 2014, no Needs Assessment had been published.  (Aug. 19 Tr. 6-8, 24-25).

To complete the Needs Assessment, the CIAB is specifically tasked with collecting information at the "census tract level" relating to each deposit bank's efforts to: (i) address the "key credit and financial services needs of small businesses"; (ii) develop and offer financial services and products that are "most needed by low and moderate income individuals and communities throughout the city," as well as provide physical branches; (iii) provide funding for "affordable housing and economic development projects in low and moderate income communities"; (iv) address "serious material and health and

---

Court's inquiry as to whether the CIAB could act before a contract was awarded pursuant to a July 21, 2014 Request for Proposals (the "July 2014 RFP") to provide drafting and analytical services to the CIAB.  Such information remains of interest to the Court on particular issues of standing and ripeness, but is ultimately not relevant to the standing analysis undertaken in this Opinion.

safety deficiencies" in foreclosed and bank-owned properties; (v) "conduct consumer outreach, settlement conferences, and similar actions relating to mortgage assistance and foreclosure prevention," and provide information at the "community district level" to the CIAB regarding those efforts; (vi) "partner in the community development efforts of the city"; (vii) "positively impact []the city" through activities such as "philanthropic work and charitable giving"; and (viii) plan for and articulate how the bank will respond to the "credit, financial and banking services needs" identified in the Needs Assessment.  (LL 38 sec. 1, subdiv. 3).  This information, "to the extent not deemed confidential or proprietary," was to have been published on the DOF's website on or around March 1, 2013, and no later than March 1, 2014.  (*Id.*).  As of the filing of the Complaint, and as of August 19, 2014, no such information had been requested, collected, or published.  (Aug. 19 Tr. 2-6, 93).

Second, the CIAB must use the information it gathers to "establish benchmarks, best practices, and recommendations for meeting the needs identified" in the Needs Assessment.  (LL 38 sec. 1, subdiv. 1(a)).  As of the filing of the Complaint, and as of August 19, 2014, no benchmarks had been set forth.  (Aug. 19 Tr. 2-6, 36).

Third, the CIAB must compile and publish a report of its findings (the "CIAB Report").  The first such report was to have been published on the DOF website and transmitted to the Banking Commission by March 1, 2015, and each March 1 thereafter.  (LL 38 sec. 1, subdiv. 1(b)).  As of the filing of the

6

Complaint, and as of August 19, 2014, no such Report had been published. (Aug. 19 Tr. 2-3, 93).

The CIAB Report must (i) evaluate how each deposit bank performed "relative to the benchmarks and best practices" established by the CIAB; (ii) identify "areas of improvement from past evaluations" as well as "areas where improvement is necessary" by the deposit banks in relation to the CIAB's "benchmarks and best practices"; (iii) "specifically identif[y] any deposit bank's failure to provide information requested in writing by" the CIAB; (iv) summarize any written comments submitted to the CIAB, and the role of those comments; and (v) "summarize[], in tabular format, the data collected" from the deposit banks, "to the extent not deemed confidential or proprietary by the bank," at the "community district, borough, and citywide levels of aggregation." (LL 38 sec. 1, subdiv. 1(b)). Lastly, the Banking Commission "may" consider the CIAB Report when evaluating whether to designate an institution as a deposit bank. (*Id.*).

By letter dated May 30, 2012, Mayor Bloomberg vetoed LL 38. (Compl. Ex. 11). Mayor Bloomberg described LL 38 as a "misguided" attempt to overlay a third layer of regulation onto an already-existing regulatory landscape, and expressed a concern that LL 38 went far beyond the purpose and purview of the DOF. (*Id.*). The Mayor concluded that LL 38 was preempted by state and federal law, and that the law was ultimately "duplicative and a waste of taxpayer resources." (*Id.*).

### 3.   The Stalled Efforts at Implementation of LL 38

On May 29, 2013, then-Speaker Christine Quinn wrote to Mayor Bloomberg to ask him to complete his appointments to the CIAB.  (Compl. Ex. 14).  Those appointments were to have been made by no later than August 27, 2012, but were not made.  (*See* LL 38 Sec. 1, Subdiv. 2).  Deputy Mayor Robert Steel responded by noting that the Mayor believed LL 38 to serve no proprietary purpose, and to in fact be "illegal" and preempted by state and federal law.  (Compl. Ex. 14).  Accordingly, Mayor Bloomberg did "not intend to make the appointment[s] provided for in Local Law 38."  (Compl. ¶ 30).  Thus, Plaintiff alleged in its Complaint that despite being passed in June 2012, as of October 2013, "Local Law 38 has not yet been enforced because of the Mayor's opposition."  (*Id.*).

## B.   The Instant Action

Plaintiff initiated the instant action on October 11, 2013.  (Dkt. #1).  In support of its contention that an "actual and justiciable controversy" existed as of October 2013, Plaintiff alleged that "[i]f Local Law 38 is upheld, NYBA members will be forced to risk potential debarment or expend resources to comply with the Law's requirements.  This Court's judgment on the legal validity of Local Law 38 will finalize the controversy and offer affected NYBA banks relief from this uncertainty."  (*See* Compl. ¶¶ 58, 64, 73, 82).  In support of its motion for a permanent injunction, Plaintiff further alleged that its members faced irreparable harm if LL 38 were enforced; specifically, NYBA members would (i) "expend resources to comply with Local Law 38's reporting

requirements"; (ii) may decide to "make certain types of loans and provide services that conflict with what is required by governing federal and State law"; (iii) "may lose the ability to be a depository for some of the City's more than $6 billion in deposits;" and (iv) "also suffer reputational harm." (*Id.* at ¶ 85).

The parties promptly signaled their intention to move for summary judgment or to dismiss the Complaint. (*See* Dkt. #10-12). The Court held a pre-motion conference on November 15, 2013. Shortly before that conference, on November 5, 2013, Bill de Blasio was elected Mayor.

At the November 15 conference, the City signaled its support for Plaintiff's motion, but noted that its position might change along with the change in City administration. Specifically, counsel for the City stated that "my directions at this point are in favor of the position that [Mayor Bloomberg] took in his veto message that the law is preempted." (Nov. 15 Tr. 24). When asked if counsel would be "getting new directions in about seven weeks," he replied, "I'll find out then. There will be a new mayor, there will be a new corporation counsel, and I really don't know until they are in place what directions I'll have at that time." (*Id.*). Counsel stated that LL 38 was "effectively stayed in the sense that the mayor is not implementing the law," but that counsel did not know what would happen after January 1, 2014, since he didn't "know what position the [new] mayor would take." (*Id.* at 25).

A significant portion of the pre-motion conference was dedicated to the issue of standing. Plaintiff again reiterated its argument that NYBA members faced (i) the prospect of "having to spend money to try to comply with the law";

9

(ii) the risk of reputational injury "when the City of New York will say that we are not complying with their unique community lending standards"; as well as (iii) possible debarment.  (Nov. 15 Tr. 6, 9).  As to the immediacy of those harms, counsel acknowledged that "[o]bviously, Mayor Bloomberg is out of office at the end of the year," but opined that "[i]f a new mayor comes in, we have every reason to believe that the new mayor will appoint members to the CIAB," and once that occurs, the CIAB will "go out and try to get this information" from NYBA's members.  (*Id.* at 5-6).  Counsel offered no evidence, nor pointed to any factual allegations in the Complaint, in support of this belief.  Instead, counsel explained:

> Really, what we are trying to do is bring our facial challenge…. We believe we have standing, that we have a threatened, realistic harm, it is not something ephemeral.  There is this board that is about to be appointed.  There is no question that Mayor Bloomberg has not appointed the members, but certainly the city council has been pressing to have the members appointed.  A new mayor is coming into office in six weeks.  When he [ap]points the board, the board will presumably effectuate all of the requirements that are in the statute, which include mandatory information gathering, mandatory publication [of] the information, and mandatory publication of judgments about banks and their compliance with these city-mandated rules which we think could conflict and will conflict with federal and state rules.  Your Honor, we think there is no question we have standing.

(*Id.* at 11).

Pursuant to a briefing schedule endorsed by the Court at the November 15, 2013 conference, Plaintiff's motion for summary judgment and the Council's motion to dismiss were each filed on December 16, 2013 (Dkt. #17,

19), and the City's letter brief in support of Plaintiff's motion for summary judgment was filed on December 23, 2013 (Dkt. #27). *Amici* American Bankers Association (in support of NYBA) and the Association for Neighborhood and Housing Development, Legal Services-NYC, New Economy Project, and the National Community Reinvestment Coalition (in support of the Council) filed supporting briefs on January 8, 2014. (Dkt. #29, 30). Plaintiff and the Council filed their opposition papers on January 27, 2014. (Dkt. #31, 34)

On February 5, 2014, counsel for the City wrote to request an extension of time to file reply papers, in order to "allow time for the City to determine, in consultation with the new Corporation Counsel Zachary W. Carter, whether its position will change in this litigation," since "Mr. Carter took office on February 1, 2014." (Dkt. #36). The Court granted the parties until March 14, 2014, to file their reply papers. (Dkt. #38). On February 28, 2014, counsel for the City again wrote the Court to request an extension of time to file reply papers, in order to allow the City "time to consider its position." (Dkt. #39). The Court granted that request. (Dkt. #40). By letter dated March 21, 2014, the City notified the Court that the City had "reconsidered its position concerning the validity of [LL 38] and now supports its validity." (Dkt. #41). The letter further noted that on December 23, 2013, the DOF had issued a

> Request for Information [("RFI")] to identify potential vendors with the capability to perform the information gathering, needs assessment, and reporting services that would be required to implement Local Law 38 should the law stand. A Request for Proposals would be the next step in the process. DOF estimates that the procurement process will likely take, at minimum, six months from today before a contractor can be put in

11

> place to begin performing the CIAB's work.  Therefore,
> we hope that sufficient time exists for the Court to
> render a decision before the CIAB begins taking actions
> that NYBA has alleged will be harmful to its members.
> We also anticipate that the Mayor will complete his
> appointments to the CIAB.

(*Id.*).

Plaintiff and the Council filed their reply papers on April 4, 2014.  (Dkt. #42, 43).  Plaintiff appended a copy of the December 23, 2013 RFI issued by the DOF to its opposition papers.  (*See* Suppl. Decl. of Matthew Schwartz, Ex. 25).  The RFI noted that information would be collected directly from the City's 25 deposit banks, and included a timeline with the following milestones: (i) by March 2014, the Mayor would appoint the members of the CIAB; (ii) data would be collected from April 2014 to October 2014; (iii) by November 1, 2014, data would be posted to the DOF website, along with the first Needs Assessment; (iv) between November 1-15, 2014, public comments would be received by the CIAB; (v) a CIAB hearing would be held between December 1-15, 2014; (vi) by March 1, 2015, the CIAB would issue its first Report; and (vii) on April 30, 2015, the Banking Commission would meet to evaluate deposit bank applications.  (*Id.*).  The RFI requested any vendor responses to be submitted by no later than January 28, 2014.  (*Id.*).

The parties have introduced no evidence that any of these events have taken place.  To the contrary, the City's March 21, 2014 letter indicates that a number of them have not occurred as anticipated.  (*See* Dkt. #41).[4]  Indeed, the

---

[4]     Defendant Council argues that because the RFI was issued by Mayor Bloomberg, approximately one week prior to the conclusion of his term, it is "meaningless" as to

Council admits that the implementation of LL 38 is "two years behind the times" relative to the deadlines set forth in LL 38.  (Aug. 19 Tr. 9).

By letter dated August 14, 2014, Plaintiff asked the Court to take judicial notice of two documents recently published by the DOF: (i) the July 21 RFP, which largely reiterated the deadlines for LL 38's implementation set forth in the December 23 RFI; and (ii) the City's 2015 annual budget, which set aside funds for the hiring of two staff members to oversee the expenditure "of $350,000 for vendor services related to the production of analytical reports as required under Local Law 38."  (Dkt. #45).

The Court held oral argument on August 19, 2014.  In response to questions regarding what had happened with respect to LL 38's implementation, the City and Council reported that the DOF expected to enter into contract with a vendor in approximately November 2014; and to begin interviewing applicants for the two new staff positions in September 2014. (Aug. 19 Tr. 2-9).  The CIAB had not convened, because while the Speaker had completed her appointments to the CIAB, the Mayor had not completed his, and the City did not know when those appointments would be completed.  (*Id*.). Accordingly, the Council reported its understanding that "LL 38 could not go forward" unless and until: (i) the DOF hired its new staff members; (ii) a contractor was selected pursuant to the RFP; and (iii) the Mayor made his

---

Mayor de Blasio.  (Council Reply 11-12).  The City's March 21, 2014 letter, however, seems to adopt the opposite position.  (*See* Dkt. #41).  At the August 19 oral argument, counsel for the City clarified that the de Blasio administration could "rely, or not, on whatever they learned from any submissions they received in response to the RFI" issued by the Bloomberg administration.  (Aug. 19 Tr. 3).

official appointments to the CIAB.  (*Id.* at 10).  Neither the City nor the Council provided a specific date by which these putative conditions precedent would be satisfied.

The Court asked Plaintiff to discuss its bases for standing as of October 2013.  Plaintiff argued, for the first time at oral argument, that it had standing by virtue of the fact that LL 38 "was enacted for no other purpose than, as the four corners of it make clear, to regulate the activities of deposit banks, [and] no one else." (Aug. 19 Tr. 45).  While Plaintiff conceded that LL 38 had yet to be implemented, it contended nonetheless that the mere existence of LL 38 "creates harm and injury … because we don't know what the legal landscape will be six months from now or eight months from now or nine months from now." (*Id.* at 14-15).  When asked, then, whether Plaintiff had standing to pursue this action when LL 38 was passed back in 2012, Plaintiff responded that, "the injury was clearer as you got closer at the end of … 2013, when there was clearly going to be a new mayor and the new mayor was going to enforce this law in a way that the prior mayor had not." (*Id.* at 45-46).  However, Plaintiff pointed to no factual allegations in the Complaint in support of this assertion.

The Court asked whether Plaintiff's members had incurred any costs in preparation for the implementation of LL 38, either as of the filing of the Complaint or as of August 19, 2014.  Plaintiff replied by noting that its members "spent millions of dollars" complying with the federal CRA, but argued that there was a "cloud over their efforts" since "[i]f they want to change

14

their systems, do things differently, they don't know what this board might or might not do when it may come into effect." (Aug. 19 Tr. 12). The Court asked again whether Plaintiff's members had incurred any costs. Plaintiff responded by arguing that "the existence of the law has created uncertainty for the banks." (*Id.* at 40). When asked yet again whether its members had incurred any costs, Plaintiff conceded that "[w]e have not put forward any affidavits in the record saying bank A has incurred these compliance costs," but explained that "the whole purpose of doing the lawsuit when we brought the lawsuit was to avoid having to incur the costs that we will obviously incur if this law is allowed to go into effect." (*Id.* at 49-50 (Plaintiff's counsel explaining that it was "cheaper to have us litigate than to incur the costs and then have to be back in court")).

## DISCUSSION

The Council moves to dismiss Plaintiff's Complaint on the basis that Plaintiff did not have standing to pursue its claims when the action was filed in October 2013.[5] The Council is correct.

---

[5] Defendant Council moves to dismiss the Complaint on standing grounds pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. (*See* Council Br. 1). Curiously, Plaintiff's summary judgment papers assert standing but do not move on that basis. (*See* Pl. Br. 29-32). Accordingly, the Court will apply the standards and presumptions applicable to a motion to dismiss, not a motion for summary judgment, and will thus accept the allegations in the Complaint to be true, but will not any draw inferences therefrom in Plaintiff's favor. *See Shipping Fin. Servs. Corp.* v. *Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) ("[W]hen the question to be considered is one involving jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." (internal citation omitted)). The Court may refer to matters outside the pleadings, such as affidavits, but may not rely on conclusory statements contained therein to establish standing. *See Robinson* v. *Malaysia*, 269 F.3d 133, 140-41 & n.6 (2d Cir. 2001).

At oral argument, Plaintiff's counsel distilled its standing, ripeness, and preemption arguments to their respective essences.  As to the first, counsel argued that the text of LL 38 is obviously and solely directed to the City's 25 designated banks, 17 of whom are members of Plaintiff.  Because of this patency, and because the authority accorded to the CIAB under LL 38 is, in Plaintiff's estimation, preempted by both federal and state law, Plaintiff had standing in October 2013 to bring a pre-enforcement challenge.  Unfortunately for Plaintiff, legal and pleading deficiencies vitiate this argument.  Recent decisions from the Supreme Court and the Second Circuit make plain that, to have standing, a plaintiff must, at the time of filing, demonstrate a "substantial risk" of a cognizable harm or a harm that is "certainly impending."  In October 2013, Plaintiff could demonstrate neither.  And while Plaintiff is correct that courts do not require a plaintiff to suffer a cognizable harm before challenging a statute, the "pre-enforcement review" cases on which it relies are readily distinguishable from the instant case.

Relatedly, the law is clear that a plaintiff must present particularized allegations of the claimed harm and its imminence.  The allegations in Plaintiff's Complaint demonstrate precisely the opposite.  What is clear from the Complaint is that, in October 2013, the incumbent mayor steadfastly opposed the implementation of LL 38.  Moreover, the Complaint fails to allege any injuries suffered or costs expended by Plaintiff as a result of LL 38, which is unsurprising in light of the statute's dead-letter status during the relevant time period.  As became clear at oral argument, all that Plaintiff had in October

2013 was a free-floating malaise that, one day in the future, a new mayoral administration might implement LL 38; this cannot suffice to constitute standing.

## A.   Applicable Law

"Article III, § 2, of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies,' which restrict the authority of federal courts to resolving the legal rights of litigants in actual controversies." *Genesis Healthcare Corp.* v. *Symczyk*, — U.S. —, 133 S. Ct. 1523, 1528 (2013) (citing *Valley Forge Christian Coll.* v. *Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982) ("The requirements of Art. III are not satisfied merely because a party requests a court of the United States to declare its legal rights, and has couched that request for forms of relief historically associated with courts of law in terms that have a familiar ring to those trained in the legal process.")).  "As an incident to the elaboration of this bedrock requirement," a plaintiff seeking to maintain an action in federal court is "always required" to have standing.  *Valley Forge Christian Coll.*, 454 U.S. at 471; *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("One of those landmarks, setting apart the 'Cases' and 'Controversies' that are the justiciable sort referred to in Article III — serving to identify those disputes which are appropriately resolved through the judicial process — is the doctrine of standing." (internal citation and quotation marks omitted)).  To that end, the issue of standing is "the threshold question in every federal case, determining the power of the court to entertain the suit."  *Kiryas Joel Alliance* v. *Vill. of*

*Kiryas Joel*, 495 F. App'x 183, 188 (2d Cir. 2012) (summary order) (internal citation omitted).

As the Supreme Court established in *Lujan*, "the irreducible constitutional minimum of standing contains three elements":

> First, the plaintiff must have suffered an injury in fact —
> an invasion of a legally protected interest which is
> (a) concrete and particularized and (b) actual or
> imminent, not conjectural or hypothetical.   Second,
> there must be a causal connection between the injury
> and the conduct complained of — the injury has to be
> fairly traceable to the challenged action of the
> defendant, and not the result of the independent action
> of some third party not before the court. Third, it must
> be likely, as opposed to merely speculative, that the
> injury will be redressed by a favorable decision.

504 U.S. at 560-61 (internal citations and quotation marks omitted).

The standing doctrine functions to "ensure[], among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake." *Friends of the Earth, Inc.* v. *Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 192 (2000); *see also Genesis Healthcare Corp.*, 133 S. Ct. at 1528 ("This requirement ensures that the Federal Judiciary confines itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved.").  In accordance with this precept, a plaintiff must establish standing for "each claim and form of relief sought." *Carver* v. *City of New York*, 621 F.3d 221, 225 (2d Cir. 2010) (internal citation omitted).  Of significance here, standing "'must exist at the commencement of litigation.'" *Davis* v. *Fed. Election Comm'n*, 554 U.S. 724, 732 (2008) (quoting *Friends of the Earth, Inc.*,

528 U.S. at 189).  Lastly, an association, which has not suffered an injury to itself, may still have standing solely as the representative of its members, provided it alleges "that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth* v. *Seldin*, 422 U.S. 490, 511 (1975) (citing *Sierra Club* v. *Morton*, 405 U.S. 727, 734-41 (1972)).

**B.    Analysis**

The Court turns first to whether Plaintiff has established an injury-in-fact.  As an initial matter, since standing is adjudged from the time the Complaint is filed, the Court is limited in its analysis to the events and injuries alleged in the Complaint, and any extrinsic materials, such as affidavits, submitted in support of those allegations.  *See Keene Corp.* v. *United States*, 508 U.S. 200, 207 (1993) (noting that it is a "longstanding principle that the jurisdiction of the Court depends upon the state of things at the time [] the action [is] brought" (internal quotation marks and citation omitted)).  However, Plaintiff has submitted no affidavits or other evidence in connection with this motion as to the issue of standing.  Accordingly, the Court must evaluate the allegations in the Complaint in order to determine whether Plaintiff has, in fact, alleged injuries in fact sufficient to confer standing.

To that end, Plaintiff alleges four primary harms that will flow to its members "if Local Law 38 is upheld": NYBA members may (i) be forced to expend resources to comply with LL 38's reporting requirements; (ii) have to

19

decide, as a result of the "benchmarks and best practices" established by the CIAB, to "make certain types of loans and provide services that conflict with what is required by governing federal and State law"; (iii) suffer reputational harm; or (iv) face potential disbarment.  (*See* Compl. ¶¶ 58, 64, 73, 82, 85). The parties dedicate a significant proportion of their briefing to the issue of whether, for instance, LL 38 could ever give rise to concrete harms.  (*See* Council Br. 10-15; Pl. Opp. 7-12; Council Reply 6-8).  Yet the Court need not reach this issue, because Plaintiff failed to demonstrate in its Complaint that those harms, whether concrete or not, were imminent.  Thus, the Court assumes for the purposes of this decision that each of the harms identified qualifies as a "concrete" harm.

Plaintiff bears the burden of demonstrating that it faces harms that are "'certainly impending,' or that there is a 'substantial risk' that the harm[s] will occur.'"  *Susan B. Anthony List* v. *Driehaus*, — U.S. —, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper* v. *Amnesty Int'l*, 538 U.S. —, 133 S. Ct. 1138, 1150 n.5 (2013)).[6]  The Supreme Court has instructed that whichever standard is applied, to the extent they are even distinct, "plaintiffs bear the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the substantial risk of harm.  Plaintiffs cannot rely on speculation

---

[6]     In its briefing, Plaintiff attempts to distinguish the holdings of *Clapper* and *Hedges* v. *Obama*, 724 F.3d 170, 200 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1936 (2014), with respect to the injury-in-fact requirement on the basis that they relate to national security issues.  (*See* Pl. Opp. 15-16).  Its argument is refuted, however, by the Court's recent holding in *Susan B. Anthony List*, which concerned Ohio election law — not national security or terrorism — yet applied the same injury-in-fact standards set forth in *Clapper* and incorporated into *Hedges*.  *See* 133 S. Ct. at 2341.

about 'the unfettered choices made by independent actors not before the court.'" *Clapper*, 133 S. Ct. at 1150 n.5 (citing *Lujan*, 504 U.S. at 562).[7] And while the Supreme Court has held that "'imminence' is concededly a somewhat elastic concept," the Court has made clear that "it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes — that the injury is 'certainly impending.'" *Lujan*, 504 U.S. at 564 n.2 (quoting *Whitmore* v. *Arkansas*, 495 U.S. 149, 158 (1990)).

Plaintiff has failed to demonstrate that, at the time it filed the Complaint in October 2013, there was a "substantial risk" that any of the harms it fears would occur, much less that they were certainly impending. The only allegation or evidence Plaintiff has submitted in support of the "imminence" of any feared harms (as distinguished from statements made at oral argument) is the simple fact that the Council wants LL 38 to be implemented and enforced. (*See* Compl. ¶ 30). But as the Complaint itself makes clear, there is a key condition precedent before LL 38 can even take effect: the appointment of the

---

[7] Plaintiff argues that *Clapper* did not "disturb" the established body of law in pre-enforcement actions requiring a plaintiff to prove a mere "probability" of injury. (Pl. Opp. 16-17). As discussed *infra*, Plaintiff has failed to demonstrate that the standards applicable to pre-enforcement actions apply here. More importantly, *Clapper* clarified that regardless of whether a court applies a "substantial risk," "certainly impending," or "clearly impending" requirement for imminence, the plaintiff bears the burden of "pleading and proving concrete facts" demonstrating that a defendant's "actual action has caused the substantial risk of harm," and may not rely on "speculation" or an "attenuated chain of inferences" to do so. *Clapper*, 133 S. Ct. at 1149-50 & n.5 (holding that plaintiffs did not have standing to challenge a statute that authorized, but did not mandate or direct, the collection of certain surveillance information; because plaintiffs had no knowledge of the Government's targeting practices, they could "only speculate as to how the Attorney General and the Director of National Intelligence will exercise their discretion in determining which communications to target," and this "attenuated chain" of events did not constitute "imminence"). For the reasons discussed throughout, Plaintiff has failed to make this showing.

CIAB.  After all, LL 38 authorizes the CIAB, and no one else, to request, compile, and publish certain categories of information, and all of Plaintiff's feared harms flow directly from these actions.  Plaintiff must concede that LL 38 had no effects in October 2013, due to the Mayor's refusal to appoint members of the CIAB.  Since the Council has — to its great frustration — no control over this process, the Council's desire to see LL 38 implemented is simply irrelevant to the issue of whether the law will be implemented or enforced imminently.

The timing of this action alone — brought mere weeks before the election of a new Mayor — indicates that Plaintiff believed the law would be implemented soon.  Now, 10 months after the Complaint's filing, Plaintiff may eventually be proven correct.  The Complaint, however, leaves that belief unstated and implicit; in effect, Plaintiff now asks the Court to read into the Complaint the circumstances of October 2013 (i.e., the anticipated change in administrations and the attendant possibility of enforcement of LL 38), without any allegations or evidence to that effect.[8]  Of course, the Complaint makes no reference to the upcoming 2013 election or incoming mayoral administration,

---

[8]     Instead, it was at the pre-motion conference that Plaintiff's counsel first made this connection to the Court, noting that "[i]f a new mayor comes in, we have every reason to believe that the new mayor will appoint members to the CIAB," and once that occurs, the CIAB will "go out and try to get this information" from NYBA members.  (Nov. 15 Tr. 5-6; *see also id.* at 11 ("When [the new mayor ap]points the board, the board will presumably effectuate all of the requirements that are in the statute, which include mandatory information gathering, mandatory publication [of] the information, and mandatory publication of judgments about banks and their compliance with these city-mandated rules which we think could conflict and will conflict with federal and state rules.")).  As discussed *supra*, however, Plaintiff has offered neither allegations nor evidence (such as a supplemental affidavit) indicating that this was even a remote possibility, let alone a substantial risk, in October 2013.

and fails to proffer any reason to believe that Plaintiff's members would be subject to LL 38 in the near future. In fact, the Complaint reveals quite the opposite: LL 38 had been on the books for 16 months, yet none of the many deadlines provided for in the law had been met, and the CIAB had not even been appointed, much less convened. *See Poe* v. *Ullman*, 367 U.S. 497, 507 (1961) (holding that a law's presence on the books does not without more confer standing). Quite simply, Plaintiff's allegations reveal — far from the CIAB being on the verge of enforcing LL 38 — that implementation and enforcement were unlikely in the near future, if at all.

To shore up its pleading failures, Plaintiff now points to the City's decision (more than three months into the new administration) to implement LL 38, as well as the December 23, 2013 RFI and the July 21, 2014 RFP, as evidence that it had standing to pursue its claims back in October 2013. (*See* Pl. Opp. 15-16; Pl. Supp. Ltr. Dated Aug. 14, 2014 (Dkt. #45)). As the parties acknowledged at oral argument (Aug. 19 Tr. 20, 34), it is inappropriate to rely on events that post-date the filing of the Complaint to determine whether standing existed *ab initio*. *Lujan*, 504 U.S. at 570 n.5 ("[S]tanding is to be determined as of the commencement of suit."); *Keene Corp.*, 508 U.S. at 207 (noting the "longstanding principle that the jurisdiction of the Court depends upon the state of things at the time of the action brought"). A contrary ruling would permit a plaintiff to file a placeholder action, and hope that the intervening events were sufficient to confer standing upon him. Unfortunately, Plaintiff appears to have done just that here. Despite its protestation to the

contrary (Aug. 19 Tr. 46), LL 38's existence *vel non* is clearly not what causes Plaintiff concern; if it were, Plaintiff surely would have initiated this action back in 2012.  Instead, Plaintiff filed this action in October 2013, months before a new mayoral administration would take office, to hedge against the odds that that new administration would not share the same reservations towards LL 38 as its predecessor.  (*See* Aug. 19 Tr. 46).  While it may be tempting to use subsequent events to validate what were nothing more than prognostications back in October 2013, the fact remains that Article III standing cannot be established through hindsight alone; instead, a plaintiff must have standing at the time the complaint is filed.  *Davis*, 554 U.S. at 734-35 (even if "the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed" (internal citations omitted)).

Plaintiff has simply failed to introduce a factual basis to imagine that its feared harms would occur, let alone occur "imminently."  Even taking every reasonable inference in Plaintiff's favor, the Complaint as pleaded reveals that the harms Plaintiff fears would only occur if (i) a new mayor were elected; (ii) that mayor wished to enforce LL 38; (iii) the mayor appointed the CIAB members; (iv) the Comptroller and Speaker made their appointments to the CIAB; (v) the CIAB were convened; and (vi) the CIAB requested information from NYBA members.  Plaintiff's other alleged harms — that its members would change their business practices as a result of the CIAB's "benchmarks," or face

reputational injury or disbarment — are thus even more remote.  Plaintiff's allegations fail to make the leap from "mere speculation to a 'credible threat.'" *Taylor* v. *Bernanke*, No. 13 Civ. 1013 (ARR), 2013 WL 4811222, at *7 (E.D.N.Y. Sept. 9, 2013) (quoting *Bauer* v. *Veneman*, 352 F.3d 625, 633 (2d Cir. 2003); *see also id.* ("The risk alleged by plaintiffs requires the type of 'highly attenuated chain of possibilities' contingent upon 'guesswork' as to the actions of third parties that *Clapper* held could not bestow standing." (quoting *Clapper*, 133 S. Ct. at 1150 n.5)); *City of Los Angeles* v. *Lyons*, 461 U.S. 95, 105, 111 (1983) (denying standing to an individual seeking to challenge a police chokehold because it was only speculative that the plaintiff would be subjected to that chokehold again in the future).

Moreover, Plaintiff has introduced no evidence demonstrating that any of its members had incurred injuries or costs at the time the Complaint was filed, and in fact, the record indicates that they had not.  *Contra Clapper*, 133 S. Ct. at 1151-52 (plaintiffs introduced evidence of present injuries sustained to protect their communications); *Pac. Capital Bank, N.A.* v. *Connecticut*, 542 F.3d 341, 347 (2d Cir. 2008) (plaintiff introduced evidence that it had already changed its business practices in an attempt to comply with the statute); *Vermont Right to Life Comm., Inc.* v. *Sorrell*, 221 F.3d 376, 381 (2d Cir. 2000) (plaintiffs introduced evidence that they had ceased non-compliant mailings in an effort to not run afoul of the statute).  Here, no NYBA member had expended any costs in responding to a CIAB request because there had been no CIAB request.  (Aug. 19 Tr. 50).  No NYBA member had changed its business

25

practices in line with the CIAB's "benchmarks" because the CIAB had not even yet been appointed, much less convened to publish "benchmarks." Lastly, no NYBA member had been threatened with reputational injury, or debarment, as a result of any CIAB report because there was, in fact, no CIAB.

Plaintiff contends that because this action is a pre-enforcement statutory challenge, and because LL 38 applies by its terms to Plaintiff's members, it need only demonstrate a "probability" of injury in order to establish standing.[9] Its argument misses the mark for several reasons. First, the term "pre-enforcement challenge" is a misnomer here, where for all intents and purposes, LL 38 was not even in effect at the time the Complaint was filed, let alone capable of being enforced in the near future. The Supreme Court's recent decision in *Susan B. Anthony List* is the latest in a long series of pre-enforcement challenges in which the plaintiff was required only to allege a "credible basis" that the statute would be enforced against them; this requirement is usually satisfied by showing that the statute applies to plaintiffs. In *Susan B. Anthony List*, the Court found that plaintiffs had standing to challenge an Ohio criminal statute, under which they had not yet been prosecuted, but had been subject to administrative proceedings. The Court held that pre-enforcement review of a statute was appropriate where

---

[9]     Plaintiff suggested repeatedly at oral argument that LL 38 was solely targeted at the City's 25 designated banks, 17 of which are NYBA members. (Aug. 19 Tr. 29 (Plaintiff arguing that LL 38 was "passed for no other reason than to change the behavior of 25 banks"), 38, 45). LL 38 need not be read so narrowly. Indeed, it is the Council's position that LL 38 "is not about the deposit banks," but instead targets "the banking needs of the city." (*Id.* at 59-60 (Council arguing that LL 38 is "a learning tool for the city … to know what servicers are being funded with its money")).

"circumstances [] render the threatened enforcement sufficiently imminent." *Id.* at 2342. The Court surveyed its prior decisions to ascertain "the circumstances under which plaintiffs may bring a pre-enforcement challenge consistent with Article III," and noted that "we have held that a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* (quoting *Babbitt* v. *Farm Workers*, 442 U.S. 289, 298 (1979)).[10]

This requirement grows out of three primary presumptions in the pre-enforcement context. First, the presumption that a government will enforce ordinary "criminal or civil punitive statutes." *Hedges*, 724 F.3d at 200; *see also Vermont Right to Life Comm.*, 221 F.3d at 383 (noting that although Vermont professed "no intention of suing VRLC for its activities," "there is nothing that prevents the State from changing its mind"; accordingly, "[i]n light of this uncertainty, the State's representation cannot remove VRLC's

---

[10] It is unclear whether the standard applied to pre-enforcement actions in *Pacific Capital* and *Vermont Right to Life Committee* is applicable in light of the Supreme Court's recent rulings in *Clapper* and *Susan B. Anthony List*, to the extent they even differ. *Compare Susan B. Anthony List*, 134 S. Ct. at 2342 ("a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder'" (internal citation omitted)), *with Pacific Capital*, 542 F.3d at 350 ("If a plaintiff's interpretation of a statute is 'reasonable enough' and under that interpretation the plaintiff 'may legitimately fear that it will face enforcement of the statute,' then the plaintiff has standing to challenge the statute." (quoting *Vermont Right to Life Comm.*, 221 F.3d at 383)). Nonetheless, both *Pacific Capital* and *Vermont Right to Life Committee* are factually inapposite and thus inapplicable here for the reasons discussed in the text.

reasonable fear that it will be subjected to penalties for its planned expressive activities.  If we held otherwise, we would be placing VRLC's asserted First Amendment rights 'at the sufferance of' Vermont's Attorney General" (internal citation omitted)).  Second, and as a result, the primary barrier to enforcement would thus be if the statute in question did not apply to plaintiffs.  For instance, in *Hedges*, U.S.-citizen plaintiffs did not have standing to challenge a statute which said "nothing at all about the authority of the government to detain citizens." *Hedges*, 724 F.3d at 193.  Third, hand-in-hand with the first two presumptions, is the Supreme Court's directive that a plaintiff need not expose himself to civil or criminal penalties prior to initiating suit; the reason being that if a plaintiff is subject to a statute, and that statute will be enforced, he need establish no more to demonstrate standing.  *See Babbitt*, 442 U.S. at 298-301 (where appellees contended that in order "to avoid criminal prosecution [they] must curtail their consumer appeals, and thus forgo full exercise of [] their First Amendment Rights," holding that "when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not 'first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute'" (internal citation omitted)).

But these presumptions are simply inapplicable here.  First, unlike the pre-enforcement cases cited throughout, the statute at issue here was only nominally in effect at the time the Complaint was filed; in fact, it was concededly impossible to enforce as of October 2013, and for the foreseeable future.  *Contra Susan B. Anthony List,* 134 S. Ct. at 2342-45 (plaintiffs had

already been subject to administrative proceedings under the statute; finding that those prior proceedings were "good evidence" the statute's criminal penalties would also be enforced against plaintiffs). Second, LL 38 provides for no civil or criminal penalties. (*Compare* Compl. ¶ 39 ("there is no specific criminal or civil sanction for a deposit bank (or bank seeking to be designated a City deposit bank) if it fails to provide information"), *with Pac. Capital Bank, N.A.* v. *Connecticut*, No. 3:06-cv-28 (PCD), 2006 WL 2331075, at *4 (D. Conn. Aug. 10, 2006) (plaintiff faced federal fines of up to $1,000,000 per day for non-compliance with state law), *aff'd*, 542 F.3d at 350-51; *Vermont Right to Life Comm.*, 221 F.3d at 380 (statute provided for fines of up to $10,000 per violation of the statute)). In fact, LL 38 does not expressly proscribe or prohibit any conduct. *See Virginia* v. *American Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (concluding that plaintiff had standing to pursue First Amendment facial challenge to state statute that criminalized the display, for commercial purposes, of certain sexually explicit materials in a manner in which juveniles may peruse or examine, on the basis that the "alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution"). For these reasons, the Court cannot simply "presume" that LL 38 would be enforced when it was not even in effect at the time the Complaint was filed. Instead, Plaintiff bore the burden of demonstrating that there was a substantial risk that LL 38 would be enforced. It has failed to discharge this burden.

Even if the standards applied to pre-enforcement actions were applicable here, Plaintiff has failed to meet them: Plaintiff nowhere alleges either "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, [or] a credible threat of prosecution thereunder.'" *Susan B. Anthony List,* 134 S. Ct. at 2342 (quoting *Babbitt,* 442 U.S. at 298). The Complaint is silent as to whether, for instance, NYBA's members intend not to provide information requested by the CIAB, or whether they have a credible belief that they will fall short of any "benchmarks" established by the CIAB. What is more, Plaintiff fails to allege an intention to engage in any conduct that is proscribed by LL 38. *See Vosse* v. *City of New York,* No. 12 Civ. 8004 (JSR), 2013 WL 6197164, at *3 (S.D.N.Y. Nov. 8, 2013) ("Plaintiff has presented no evidence that she is planning to violate Section 32-655 in any way[.]").[11]

Lastly, even assuming the allegations in the Complaint established standing, closely related principles of declaratory judgment law warrant dismissal. Specifically, "[a] declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest. It is always the duty of a court of equity to strike a proper balance between the needs of the plaintiff and the consequences of giving the desired relief." *Eccles* v. *Peoples Bank of Lakewood Vill.,* 333 U.S. 426, 431

---

[11]   Plaintiff contends that the reputational harm and threat of disbarment implicit in LL 38 constitute penalties (Pl. Opp. 31); yet the fact remains that, by its terms, LL 38 does not actually prohibit or proscribe any conduct. The Court takes no position on whether the threats of reputational injury or disbarment — whether explicit or implicit — could ever constitute penalties.

30

(1948) (internal citations omitted); *see also Abidor* v. *Napolitano*, 990 F. Supp. 2d 260, 272 (E.D.N.Y. 2013) ("An action for declaratory judgment does not provide an occasion for addressing a claim of alleged injury based on speculation as to conduct which may or may not occur at some unspecified future date." (citing, *inter alia*, *Lujan*, 504 U.S. at 560)). Thus, "[e]specially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative." *Abidor*, 990 F. Supp. 2d at 272 (internal citations omitted).

Plaintiff has failed to establish that, at the time of the Complaint's filing in October 2013, the injuries it identified were imminent, or were subject to a substantial risk of occurrence. Instead, the Complaint as pleaded reveals only that those harms would arise if a conjectural concatenation of events occurred in sequence; this is the very definition of an "attenuated chain." *Clapper*, 133 S. Ct. at 1150 n.5. Because Plaintiff's injuries were simply far "too speculative for Article III purposes," *Lujan*, 504 U.S. at 565 n.2, its present request is a "prototypical request for an advisory opinion." *Knife Rights, Inc.* v. *Vance*, No. 11 Civ. 3918 (KBF), 2013 WL 5434610, at *4 (S.D.N.Y. Sept. 25, 2013). "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Susan B. Anthony List*, 134 S. Ct. at 2341 (quoting *Clapper*, 133 S. Ct. at 1146).

Accordingly, the Complaint must be dismissed.[12]  This dismissal, however, is without prejudice.  *See Wells Fargo Bank, N.A.* v. *Ullah*, No. 13 Civ. 0485 (JPO), 2014 WL 2117243, at *3 (S.D.N.Y. May 21, 2014) ("Dismissals for lack of standing are dismissals without prejudice because standing may ebb and flow.  A party without standing may later acquire it."); *see generally Jackson-Bey* v. *Hanslmaier*, 115 F.3d 1091, 1098 (2d Cir. 1997) (affirming dismissal without prejudice for lack of standing).  Plaintiff brings serious substantive claims, and while it did not have standing to pursue them in October 2013, the Court takes no position on whether pleading modified in accordance with this Opinion, in addition to the events of the intervening year — or, alternatively, the occurrence of certain anticipated events, such as the convening of the CIAB or the award of the contract to provide support

---

[12]    The City has not moved to dismiss the Complaint.  Instead, it has filed a letter asserting its "support" for the Council's motion, but not so moving itself.  (*See* Dkt. #41).  Nonetheless, having determined that Plaintiff lacks standing, pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure, the Court must *sua sponte* dismiss the Complaint as to the City.  *See Bernstein* v. *Universal Pictures, Inc.*, 517 F.2d 976, 979 (2d Cir. 1975) ("There can be little doubt that a district court should be alert to terminate an action under Rule 12(h)(3) when lack of subject matter jurisdiction becomes apparent.  Judicial resources are precious, particularly in view of the courts' steadily burgeoning caseload, and they should not be dissipated in futile proceedings.  Indeed, the lack of jurisdiction is so fundamental a defect that the rule permits a judge to recognize it sua sponte at any time."); *see also FW/PBS, Inc.* v. *City of Dallas*, 493 U.S. 215, 231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" (quoting *Allen* v. *Wright*, 468 U.S. 737, 750 (1984)); *Mancuso* v. *Consol. Edison Co. of N.Y.*, 130 F. Supp. 2d 584, 588 (S.D.N.Y. 2001) ("[T]he issue of standing can be raised on motion of a party or even *sua sponte* at any time during the litigation or appeal; it cannot be waived." (citing, *inter alia*, *United States* v. *Hays,* 515 U.S. 737, 742 (1995)), *aff'd*, 25 F. App'x 12 (2d Cir. 2002) (summary order).

services to the CIAB — would be sufficient to establish standing.  Defendant

Council's motion to dismiss is granted.[13]

## CONCLUSION

Plaintiff has failed to demonstrate that it had standing to pursue its

claims at the time the action was filed.  Accordingly, this action is dismissed

without prejudice.  Defendant Council's motion to dismiss is GRANTED.  The

Clerk of Court is directed to terminate the remaining motions and to mark this

case as closed.

SO ORDERED.

Dated: September 9, 2014
      New York, New York

                                                 _____
                                                  KATHERINE POLK FAILLA
                                         United States District Judge

---

[13]     The Court need not reach the Council's argument with respect to ripeness, having dismissed the Complaint on standing grounds.